UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSEMOUNT AEROSPACE INC.<br><br>Plaintiff,<br><br>vs.<br><br>HARCO LABORATORIES, INC., a Connecticut Corporation and BRAD POWELL, an Individual<br><br>Defendants. | Civil Action No. 303-CV-0444 (AWT)<br><br>November 25, 2003 |

### FIRST AMENDED COMPLAINT

For its complaint against Defendants, Plaintiff Rosemount Aerospace Inc. ("Rosemount Aerospace") states and alleges as follows:

### PARTIES

1. Rosemount Aerospace is a corporation organized and existing under the laws of Delaware and has a principal place of business at 14300 Judicial Road, Burnsville, Minnesota, 55306-4898. Rosemount Aerospace is engaged in the business of designing, developing, manufacturing, selling, maintaining and servicing temperature sensors for use on aircraft, including the total air temperature sensor shown in the photograph attached hereto as Exhibit 1.

2. Upon information and belief, Defendant Harco Laboratories, Inc. ("Harco") is a corporation organized and existing under the laws of Connecticut and has a principal place of business at 186 Cedar Street, Branford, Connecticut 06405-0010. Among other businesses, Harco is engaged in the business of manufacturing and selling temperature sensors for use on aircraft.

3. Upon information and belief, Defendant Brad Powell ("Powell") is an individual who resides in Connecticut. Powell is a former employee of Weed Instrument Company, Inc. ("Weed") and is currently employed by Harco.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) because it is a controversy between citizens of different States and the amount in controversy exceeds $75,000.00, exclusive of costs, at least in the form of unjust enrichment from the actions complained of herein.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

6. On December 5, 1994, Rosemount Aerospace and Weed executed an Asset Purchase Agreement (the "Purchase Agreement") for the purchase of Weed's Aerospace Division by Rosemount Aerospace. As of the execution of the Purchase Agreement, Weed's Aerospace Division was engaged in the design, development, manufacture, sale, maintenance and servicing of temperature sensors, including but not limited to total air temperature sensors. The Purchase Agreement had a closing date (the "Closing") of January 3, 1995.

7. Through its acquisition of Weed's Aerospace Division, Rosemount Aerospace paid for, bargained for, and acquired trade secret and proprietary information regarding a variety of Weed's products, including total air temperature sensors. A photograph of Weed's total air temperature sensor ("Weed Total Air Temperature Sensor") is attached hereto as Exhibit 2.

8. To protect the value of the assets Rosemount Aerospace purchased from Weed, and as part of the agreement bargained and paid for, the Purchase Agreement included a non-competition covenant, as well as provisions relating to the non-use and non-disclosure of certain information by Weed after the Closing. In particular, Weed (the Seller) and Rosemount Aerospace (the Buyer) agreed as follows:

> 8.10 <u>Non-Competition Covenant.</u> Seller agrees that it shall not, for a period of seven years from the Closing, at any place throughout the world, either directly or indirectly, alone or with or on behalf of any other person or entity, Participate (as hereinafter defined) in the design, development, creation, testing, assembly, manufacture, servicing, distribution, license, lease or sale of products for the Aerospace Market (as hereinafter defined) currently or heretofore manufactured by Seller or Buyer, competitive with such products or performing the same function as such products, nor will Seller become associated in any business capacity whatsoever with another business, directly or indirectly, whether by license, partnership, joint venture, sponsor or any other form of cooperative effort or relationship, in connection with the design, development, creation, testing, assembly, manufacture, servicing, distribution, license, lease or sale of products for the Aerospace Market currently of heretofore manufactured by Seller or Buyer, competitive with such products or performing the same function as such products. For purpose of this Agreement, the term "Participate" includes, without limitation, any direct or indirect involvement, participation of (sic) liaison with or in, or organization of, any business or enterprise, whether as a partner, sole proprietor, licensor, agent, representative, independent contractor, advisor, consultant, creditor, stockholder, owner or otherwise, other than by ownership of less than five percent of the stock of a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market. For purposes of this Agreement the term "Aerospace Market" includes fixed and rotary wing craft, space vehicles, missiles and unmanned vehicles, and related test and ground support equipment and gas turbine engines for use on aerospace, marine or ground applications and any other market served by the Business.
>
> 8.11 <u>Non-Use; Non-Disclosure.</u> Seller shall not have any right, license or power to use the technology, information or Intellectual Property Rights and Know How related to the Business ("IP Rights") other than as is permitted under the Supply Agreement or

the License and, accordingly, shall not have at any time any right to otherwise use or disclose IP Rights after the Closing Date.

Seller will hold in confidence and will not use, and will use reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold in confidence and not use, all documents and information related to the Business, except that this restriction shall not apply to information that (i) is disclosed in published literature or in issued patents; (ii) is generally known to the public or in the public domain through no fault of Seller; (iii) is required to be disclosed by order of any court or governmental agency having jurisdiction over Seller; or (iv) is required to be disclosed in fulfilling a legal obligation, such as the filing of tax returns. In the event that Seller becomes legally compelled to disclose any such information, Seller shall provide Buyer with prompt notice of such requirement so that Buyer may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, Seller shall furnish only that portion of such information which is in the opinion of its counsel legally required and will cooperate with, and not oppose, action by Buyer to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information. Seller will be responsible for the fees and expenses of its counsel in connection with any actions taken under the preceding sentence.

9. Upon information and belief, Powell worked for Weed at the time the Purchase Agreement was executed. Powell had access to proprietary technical information regarding Weed's total air temperature sensors and was knowledgeable about the skills possessed by other Weed employees relating to the design, assembly and/or manufacture of Weed's total air temperature sensors. Upon information and belief, Powell also knew that Weed was subject to the non-competition covenant and the non-use and non-disclosure provisions in the Purchase Agreement.

10. To protect the value of its assets, Rosemount Aerospace, including through its predecessor in interest, Weed, required employees to execute agreements relating to the confidentiality of trade secrets. When Powell first joined Weed as an

4

employee in 1991, he signed a document titled, "Employee Agreement Relating to Trade Secrets and Non-Competition" (the "Powell Agreement"). The Powell Agreement included the following obligations:

> 1. EMPLOYEE agrees to promptly disclose in writing and does hereby assign all ideas, concepts, processes, discoveries, improvements, and inventions made by EMPLOYEE alone or jointly with others in the course of such employment or within one year of the termination of such employment, which relate to the business of WEED (hereinafter "Information"), and agrees to cooperate fully in any such action or actions reasonably required to protect the rights of WEED in all countries of the world with respect to any such information. It is recognized that the confidential information acquired by EMPLOYEE in connection with such employment is to remain confidential and is not to be used, copied, or divulged, or caused or permitted to be used, copied, or divulged except when authorized in writing by WEED. This obligation shall continue so long as such information remains legally protectable as to persons receiving it in a confidential relationship.

11. Upon information and belief, during the course of his employment at Weed, Powell acquired trade secrets and confidential information relating to Weed's various technologies and products.

12. Upon information and belief, Weed has not authorized Powell to use or divulge any of the trade secrets or confidential information he obtained during his employment at Weed. Trade secrets and confidential information Powell obtained in connection with his employment at Weed are legally protectable property of Rosemount Aerospace due to their transfer under the Purchase Agreement.

13. The Powell Agreement also included a provision regarding the treatment of Weed's property upon termination of Powell's employment with Weed. Under this provision, Powell agreed as follows:

> 5. EMPLOYEE agrees that upon termination of employment for whatever reason, EMPLOYEE will surrender to WEED all sales (including customer and prospect lists), marketing, research, engineering, financial, management and other records, prints, drawings, papers, objects, and parts thereof, pertaining to any phase of the business of WEED, and that EMPLOYEE will not take or retain any reproductions, copies, blueprints, or models thereof.

14. Upon information and belief, when Powell left his employment with Weed, he failed to surrender to Weed certain materials, including a total air temperature sensor manufactured by and owned by Weed. Under the Purchase Agreement, the Weed Total Air Temperature Sensor is the property of Rosemount Aerospace and Powell has not been authorized in any way to keep it in his possession.

15. In 1998, Harco hired Powell as its Director of Advanced Technology. Upon information and belief, Powell proposed to the management of Harco that Harco design, manufacture and sell total air temperature sensors that would directly compete with Rosemount Aerospace's total air temperature sensor.

16. Upon information and belief, while employed at Harco, Powell used and provided to Harco the Weed Total Air Temperature Sensor as well as trade secrets and confidential information subject to the provisions of the Powell Agreement, including but not limited to paragraphs 1 and 5 thereof. And pursuant to the Purchase Agreement, the Weed Total Air Temperature Sensor and such trade secrets and confidential information was the property of Rosemount Aerospace. Upon information and belief, both Powell and Harco knew the Weed Total Air Temperature Sensor and such trade secrets and confidential information disclosed by Powell to Harco regarding Weed's aerospace products was trade secret and confidential information of Rosemount Aerospace.

17. To help Harco compete with Rosemount Aerospace, Powell contacted several Weed employees from 1999 to 2002, including Glenn Beatty ("Beatty"), to solicit their assistance in the design, development, creation, testing, assembly, and manufacture of aerospace products. Beatty and other Weed employees responded favorably to Powell's and Harco's solicitation, and Harco eventually hired and paid these Weed employees on a contract basis to assist in the design, development, creation, testing, assembly, and manufacture of aerospace products. The activities of Harco and the Weed employees took place within the unexpired term of the non-competition covenant in the Purchase Agreement.

18. Upon information and belief, when Powell contacted the Weed employees from 1999 - 2002, both he and Harco knew Beatty and the other Weed employees were contractually obligated to Weed not to disclose Weed trade secrets and confidential information pursuant to the Purchase Agreement.

19. Upon information and belief, when Powell contacted the Weed employees from 1999 - 2002, both he and Harco knew Beatty and the other Weed employees had knowledge of Weed trade secrets and confidential information relating to the manufacture of aerospace products, and in particular, certain highly valuable brazing techniques necessary to manufacture total air temperature sensors, that such information was developed at Weed, and that such information was sold by Weed to Rosemount Aerospace pursuant to the Purchase Agreement. Upon information and belief, when Powell contacted the Weed employees from 1999 - 2002, both he and Harco knew that Rosemount Aerospace took reasonable measures to maintain the secrecy of the Weed

trade secrets and confidential information known to Beatty and the other Weed employees.

20.     In 2001, Powell and Harco induced, contracted, and paid John Labaj ("Labaj"), a Weed employee, to provide certain training for Harco employees. Thereafter, in May, 2001, Labaj provided training at Harco's facilities to Harco's employees for nine consecutive days concerning brazing techniques to manufacture total air temperature sensors, such techniques having been previously developed by Weed, sold to Rosemount Aerospace, and subject to the provisions of the Purchase Agreement. Upon information and belief, Powell and Harco knew that the information about which Labaj trained Harco employees constituted valuable Weed trade secrets and confidential information owned by Rosemount Aerospace. For this reason Powell and Harco attempted to conceal Labaj's nine day visit to Harco facilities. These measures included, but were not necessarily limited to, Labaj charging his expenses to Powell's credit card.

21.     Upon information and belief, when Powell contacted Beatty, Powell knew Beatty was subject to an employment agreement with Weed (the "Beatty Agreement") similar to the one Powell signed when he worked for Weed. The Beatty Agreement included a confidentiality provision under which, Beatty (the employee) and Weed (the employer) agreed as follows:

1. EMPLOYEE agrees to promptly disclose in writing and does hereby assign all ideas, concepts, processes, discoveries, improvements, and inventions made by EMPLOYEE alone or jointly with others in the course of such employment or within one year of the termination of such employment, which relate to the business of WEED (hereinafter "Information"), and agrees to cooperate fully in any such action or actions reasonably required to protect the rights of WEED in all countries of the world with respect to any such information. It is recognized that the confidential information acquired by EMPLOYEE in connection with such employment is to remain confidential and is not to be used, copied, or divulged, or caused or permitted to be used, copied, or divulged except when authorized in writing by WEED. This obligation shall continue so long as such information remains legally protectable as to persons receiving it in a confidential relationship.

22. As a result of the assistance Powell, Beatty and Labaj provided to Harco, Harco completed a design of a total air temperature sensor, and brought such product to market. Attached hereto as Exhibit 3 is a Harco advertisement marketing and offering for sale to the aerospace market a total air temperature sensor. A photograph of a Harco total air temperature sensor is attached hereto as Exhibit 4. Upon information and belief, but for the assistance provided by Powell and the Weed employees to Harco in violation of the Purchase Agreement, the Powell Agreement, and the Beatty Agreement, Harco would not have been able to complete the design, development and manufacture of total air temperature sensors, and/or would have brought such product to market much later than it has brought it. Rosemount Aerospace has been and will continue to be damaged by these activities, including, but not limited to the continued misappropriation of the trade secrets and confidential information purchased by Rosemount Aerospace from Weed pursuant to the Purchase Agreement (such information still maintained as trade secrets and confidential information by Rosemount Aerospace), and the loss of business by Rosemount Aerospace and damage to Rosemount Aerospace's goodwill.

23.     Upon information and belief, Powell, Harco, Beatty, and Labaj knew that the above-described activities breached the Purchase Agreement, including at least the non-competition covenant in paragraph 8.10 of the Purchase Agreement and the confidentiality provisions in paragraph 8.11 of the Purchase Agreement, and paragraph 1 of the Powell and Beatty Agreements, and that this breach resulted in Harco's misappropriation of Rosemount Aerospace assets that would harm Rosemount Aerospace and defeat the bargained-for and paid-for benefit of the Purchase Agreement.

## COUNT I

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST HARCO

1. – 23.     Rosemount Aerospace repeats and realleges the paragraphs 1 – 23 as if fully set forth herein.

24.     The cause of action set forth arises under the laws of the state of Connecticut.

25.     Harco tortiously interfered with Rosemount Aerospace's contractual relations with Weed, and the contracts with Powell and Beatty.

26.     Harco induced Weed to breach the Purchase Agreement by soliciting participation from Weed in the design, development, creation, testing, assembly and/or manufacture of Harco's total air temperature sensor in violation of the Purchase Agreement, including at least the non-competition covenant in paragraphs 8.10 and 8.11 of the Agreement.

27.     Harco induced Powell to breach the Powell Agreement by soliciting participation from Powell in the design, development, creation, testing, assembly and/or manufacture of Harco's total air temperature sensor in a manner that caused such a

10

breach. In particular, Harco induced Powell to disclose trade secrets and confidential information in violation of the Powell Agreement, including at least the confidentiality provision in paragraph 1 of the Agreement, and use assets of Weed in violation of the Powell Agreement.

28. Harco induced Beatty to breach the Beatty Agreement by soliciting participation from Beatty in the design, development, creation, testing, assembly and/or manufacture of Harco's total air temperature sensor in a manner that caused such a breach. In particular, Harco induced Beatty to disclose trade secrets and confidential information in violation of the Beatty Agreement, including at least the confidentiality provision in paragraph 1 of the Agreement.

29. Harco induced the breach of the Purchase Agreement, fully aware that Weed had executed the Purchase Agreement with Rosemount Aerospace that prohibited Weed from using certain confidential information and assisting Harco in the manner described above. In fact, Harco took steps to conceal its activities because it was fully aware that its activities would cause a breach of the Purchase Agreement by Weed.

30. Harco induced the breach of the Powell Agreement, fully aware that Powell had executed the Powell Agreement with Weed that prohibited Powell from assisting Harco in the manner described above.

31. Harco induced the breach of the Beatty Agreement, fully aware that Beatty had executed the Beatty Agreement with Weed that prohibited Beatty from assisting Harco in the manner described above.

32. Harco's actions were taken with the knowledge that a breach of the Purchase Agreement and the Powell and Beatty Agreements would harm Rosemount

Aerospace, either as a party to the Weed, Powell and Beatty Agreements or as a successor in interest or beneficiary of such agreements. In fact, as a direct result of the benefits it obtained from inducing the breach of the Weed, Powell and Beatty Agreements, Harco has bid against Rosemount Aerospace on contracts for such products, and on at least one occasion has obtained business that it knew would have otherwise gone to Rosemount Aerospace. Harco knew that the breaches of the Weed, Powell and/or Beatty Agreements it induced would unfairly enrich it at Rosemount Aerospace's expense. Indeed, the breaches harmed Rosemount Aerospace more than any other actual or potential competitor.

33. Harco's inducement and tortious interference was without justification.

34. Rosemount Aerospace has suffered harm and damage as a result of Harco's tortious interference and inducement of these breaches and is likely to continue to be harmed and damaged unless Harco is enjoined in a manner that redresses such inducement of breaches. Harco has been unjustly enriched by the services it obtained from Weed, Powell and Beatty in violation of the Weed, Powell and Beatty Agreements.

## COUNT II

### VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT AGAINST HARCO

1. – 34. Rosemount Aerospace repeats and realleges the paragraphs 1-34 as if fully set forth herein.

35. The cause of action set forth arises under the laws of the state of Connecticut.

36. By and through its actions, Harco has misappropriated Weed trade secrets and confidential information, including information relating to brazing techniques. Harco

knew that such information was developed at Weed, was owned by Rosemount Aerospace, was of great value to Rosemount Aerospace, and was the subject of reasonable efforts by Weed and Rosemount Aerospace to maintain its secrecy.

37. Harco used the misappropriated trade secrets and confidential information, including information relating to brazing techniques to aid Harco's completion of products, including total air temperature sensors, and brought such products to market. Upon information and belief, but for its misappropriation of the trade secrets and confidential information, Harco would not have been able to complete the design, development and manufacture of such products, and/or would have brought such products to market much later than it has brought it.

38. Harco has misappropriated and its actions constitute further, threatened misappropriation of Rosemount Aerospace's trade secrets under the Connecticut Uniform Trade Secrets Act.

39. Harco's misappropriation of Rosemount Aerospace's trade secrets has been willful.

40. Harco's violations of the Connecticut Uniform Trade Secrets Act have damaged Rosemount Aerospace.

41. Rosemount Aerospace has no adequate remedy at law for Harco's violations of the Connecticut Uniform Trade Secrets Act.

42. As a result of the foregoing, Harco is liable to Rosemount Aerospace for double the actual damages proven at trial, together with attorney's fees, as provided by the Connecticut Uniform Trade Secrets Act.

## COUNT III

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT AGAINST HARCO

1. – 42.    Rosemount Aerospace repeats and realleges the paragraphs 1-42 as if fully set forth herein.

43.    Harco's actions herein constitute ongoing and threatened violations of the Connecticut Unfair Trade Practices Act.

44.    Harco's ongoing and threatened violations of the Connecticut Unfair Trade Practices Act have been willful.

45.    Harco's violations of the Connecticut Unfair Trade Practices Act have damaged Rosemount Aerospace.

46.    Rosemount Aerospace has no adequate remedy at law for Harco's violations of the Connecticut Unfair Trade Practices Act.

47.    As a result of the foregoing, Harco is liable to Rosemount Aerospace for attorney's fees, as provided by the Connecticut Unfair Trade Practices Act.

## COUNT IV

## BREACH OF CONTRACT AGAINST POWELL

1. – 47.    Rosemount Aerospace repeats and realleges the paragraphs 1-47 as if fully set forth herein.

48.    The cause of action set forth arises under the laws of the state of Texas, as specified in the Powell Agreement.

49.    Powell breached the Powell Agreement, at least by his direct or indirect involvement or participation in the design, development, creation, testing, assembly and/or manufacture of Harco's total air temperature sensor. These activities in breach of

the Powell Agreement include direct assistance to Harco, disclosure of Weed's or Rosemount Aerospace's trade secrets and confidential information, and failure to return to Weed or its successor in interest or beneficiary Rosemount Aerospace any and all Weed property upon termination of Powell's employment with Weed.

50. Rosemount Aerospace has suffered harm and damage as a result of Powell's breach and is likely to continue to be harmed and damaged.

**WHEREFORE**, Rosemount Aerospace prays that the Court enter an order:

A. Enjoining Harco, its directors, officers, agents, servants, employees, subsidiaries, affiliates, and all persons in active concert or participation with, through, or under Harco from continued manufacture, distribution, display, offering for sale, marketing, use and sale of any and all Harco products, including but not necessarily limited to Harco's total air temperature sensor, that were built and manufactured with the wrongful participation of Weed employees and/or the misappropriated trade secrets of Rosemount Aerospace, including but not limited to the Harco total air temperature sensor designs shown in Exhibits 3 and 4, for a period of four years;

B. Awarding to Rosemount Aerospace all of Harco's profits resulting from its sales of any and all Harco products, including but not necessarily limited to total air temperature sensors, that were built and manufactured with the wrongful participation of Weed employees and/or the misappropriated trade secrets of Rosemount Aerospace, and Rosemount Aerospace's damages resulting from such of Harco's sales, at least in the form of the unjust enrichment of Harco through the wrongfully induced participation of Weed employees, with interest;

C. An award requiring Harco to pay for Rosemount Aerospace's attorneys' fees and costs, plus interest, as damages arising from the wrongful actions described herein, and/or under other powers of the Court that may apply;

D. An order requiring Harco and Powell to deliver to this Court, for destruction, all copies in Harco's possession or control of all of the sensors, test equipment, parts, documents, and other items and pictorial or graphic representations thereof and of advertisements and promotional materials depicting the items that were built with the wrongful participation of Weed employees and/or the use of misappropriated trade secrets of Rosemount Aerospace, as well as all molds, patterns, prints, assembly instructions and other items;

E. A judgment that Harco tortiously interfered with Rosemount Aerospace's contractual relations with Weed;

F. A judgment that Harco tortiously interfered with Rosemount Aerospace's contractual relations with Beatty;

G. Permanent injunctive relief against Harco, ordering Harco and Harco's officers, directors, agents, servants, employees, attorney's and all others acting under or through it, and Powell, to refrain from disclosing or making use of the trade secrets and confidential information of Rosemount Aerospace;

H. A judgment that Powell breached his contract with Weed and awarding damages for such breach;

I. Awarding Rosemount Aerospace all such other relief as the Court shall deem just and proper, including punitive damages against Harco as permitted by law.

Rosemount Aerospace hereby demands a trial by jury of all issues so triable.

                PLAINTIFF, ROSEMOUNT AEROSPACE INC.,

by: _____
      James Mahanna (ct24681)
      Day, Berry & Howard LLP
      CityPlace I
      Hartford, Connecticut  06103-3499
      Tel: (860) 275-0100
      Fax: (860) 275-0343

      Daniel W. McDonald (ct23281)
      William D. Schultz (ct25198)
      Merchant & Gould, P.C.
      3200 IDS Center
      80 South Eighth Street
      Minneapolis, Minnesota  55402-2215
      Tel: (612) 332-5300
      Fax: (612) 332-9081

      Its Attorneys