UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROSEMOUNT AEROSPACE, INC.,    :

                Plaintiff,    :      Civil Action No. 303CV0444 (AWT)

          vs.          :

WEED INSTRUMENT COMPANY, INC., :
and HARCO LABORATORIES, INC.,    :

          Defendants.  :      AUGUST 12, 2004

**<u>DEFENDANTS' MOTION FOR PROTECTIVE ORDER</u>**

Defendants Harco Laboratories, Inc. ("Harco") and Brad Powell ("Powell") respectfully move for entry of an Order:

(a)      pursuant to Federal Rules of Civil Procedure 26(b)(2), 26(c) and 30(a)(2)(A), modifying the Case Schedule by granting Defendants leave to conduct more than ten depositions in this action and extending the deadline for completion of fact witness depositions past the September 10, 2004 deadline as a result of the Plaintiff's refusal to attend depositions already noticed;

(b)      pursuant to Federal Rules of Civil Procedure 37(a) and 37(d), compelling Plaintiff Rosemount Aerospace, Inc. ("Rosemount") to submit to depositions under Rule 30(b)(6), pursuant to the Defendants' Notice of Deposition, dated July 29, 2004;

(c)      pursuant to Federal Rules of Civil Procedure 30(b)(7) and 37(a)(1), compelling James M. Rashid, Group Counsel of Rosemount's parent corporation, Goodrich Corporation, to submit to a deposition, pursuant to the Defendants' Notice of Deposition, dated August 6, 2004;

(d)    pursuant to Federal Rule of Civil Procedure 37(a), compelling Rosemount to produce a certain facsimile cover page without redactions, or, in the alternative, present it to the Court for *in camera* inspection; and

(e)    pursuant to Federal Rules of Civil Procedure 37(a)(2) and (4), granting appropriate sanctions for Rosemount's refusal to submit to the noticed discovery, including reasonable expenses and attorneys' fees for the making of this motion.

## A.    Background and Rosemount's Claims

1.    A brief description of the background of this case places the relief requested in proper context.   In substance, Rosemount brings this lawsuit for purported misappropriation of trade secrets and proprietary information by Harco and Powell of an aerospace product called a total air temperature sensor ("TAT sensor") that is used on a military aircraft to measure outside temperatures at high altitudes and velocities and that is critical to the control of the aircraft.   In that regard, Rosemount alleges claims against Harco for tortious interference with contractual relations, violation of the Connecticut Uniform Trade Secrets Act and the Connecticut Unfair Trade Practices Act; and Rosemount alleges a breach of contract claim against Powell.

2.    There are now three litigations between Rosemount and Harco pending in this Court.  Rosemount brought this action against Harco after Harco had commenced a lawsuit against Rosemount contesting the validity of the trademark that Rosemount filed for its TAT sensor (the "Trademark Litigation").   Cross-motions for summary judgment have been sub judice in the Trademark Litigation since August 2003.  Harco also filed a complaint in this Court on July 28, 2004, asserting antitrust claims against Rosemount and its parent, Goodrich Corporation, concerning their sale of TAT sensors.

3.     The underlying facts of this case may be summarized as follows.   In December 1994, Rosemount purchased the Aerospace Division of Weed Instrument, Inc. ("Weed") and allegedly acquired trade secret and proprietary information regarding a variety of products, including TAT sensors.  Rosemount previously had a patent on its TAT sensor that had expired years ago.  Weed manufactured its TAT sensor by reverse engineering of Rosemount's TAT sensor, and Weed became competition to Rosemount's domination of the TAT sensor market.    The purchase contract between Weed and Rosemount included a non-compete agreement pursuant to which Weed agreed not to compete in the market for aerospace products manufactured by Rosemount or Weed, including TAT sensors, for seven years.

4.     Rosemount's claims against Harco are based on Harco's purported tortious interference that caused Weed to breach the non-compete and confidentiality provisions in the contract between Rosemount and Weed.  Rosemount's claim against Powell is for alleged breach of his non-compete and confidentiality agreement with Weed.

5.     Rosemount also brought a breach of contract claim in this action against Weed that was settled.  Rosemount dismissed Weed from the case for $25,000, payable in five installments of $5,000 over five years, together with Weed's concession of liability and agreement to cooperate with Rosemount in this litigation.   Weed's former President, Bobby Vernengo, testified, in substance, that Weed settled to avoid the time and expense of litigation, and because he acknowledges that Weed could have done more than it did to inform Weed's employees about the non-compete agreement between Weed and Rosemount and how it impacted them.

6.     Weed's employees were not parties to the asset purchase agreement between Rosemount and Weed, and Rosemount did not hire any Weed employees.  Witnesses on

behalf of Rosemount and Weed have testified that after the asset purchase agreement was executed, Weed's employees were free to leave Weed to work in the aerospace industry; and Weed's employees were restricted only to the extent of the terms of an agreement between them and Weed, if any.

7.      When Rosemount and Weed entered into their 1994 asset purchase agreement, Powell worked for Weed's Aerospace Division.  According to Rosemount, Powell had access to proprietary technical information regarding Weed's aerospace products, and in particular, Weed's TAT sensor; and he was knowledgeable about other Weed employees who had skills in the manufacture and sale of Weed's aerospace products, and in particular, Weed's TAT sensors.  Also, Rosemount asserts that Powell knew about the 1994 asset purchase agreement and knew Weed was subject to the non-compete agreement with Rosemount.

8.      Powell left Weed in 1995 for employment at other companies where he worked on temperature sensor products until November 1998, when he was hired by Harco as Director of Advanced Technology.  Powell testified that no one at Weed or Rosemount told him that he was restricted in what work he could do after he left Weed.  He began working on a TAT sensor at Harco that would directly compete with Rosemount's TAT sensor.  Harco later hired another former Weed employee, Jorge Martinez, who also worked on Harco's TAT sensor. Powell solicited the assistance of two other Weed employees, John Labaj and Glenn Beatty ("Beatty"), for small projects as independent contractors on Harco's TAT sensor.  Beatty continued to perform small projects for Harco after he left his employment at Weed.

9.      According to Rosemount, Harco was able to bring to market its version of a TAT sensor earlier than it could have without the assistance of former or present Weed employees, thereby causing Rosemount to lose business.

**B.**    **Harco and Powell's Response**

10.    Simply stated, Harco and Powell maintain that this action illegally seeks to drive Harco out of the TAT sensor business in order for Rosemount to control it.  It is a transparent attempt to harass Harco and Powell with meritless claims and cause unnecessary litigation expenses. Harco and its employees did not use any of Weed's proprietary and/or confidential information, and did not violate any laws as alleged in Rosemount's complaint. Harco and its employees are not parties to or bound by the agreement between Rosemount and Weed.  Powell worked on aerospace temperature sensors at Allied Signal Aerospace Company before he worked at Weed.  Indeed, the evidence shows that Weed hired Powell precisely because of his prior knowledge and experience in that field. Powell legitimately used his aerospace engineering knowledge and expertise that he learned and developed before his employment at Weed for the work he performed at Harco.  This is the classic case of a company improperly attempting to preclude an experienced engineer from earning a livelihood using his specialized  knowledge and skills that are not trade secrets.

11.    Harco and Powell contend that their actions were in good faith and for legitimate business reasons, neither willful nor malicious, and were based on reasonable factors other than as alleged.  They further allege that Rosemount's complaint is time-barred by the applicable statute of limitations, and is barred by Rosemount's unclean hands, bad faith and improper purposes of harassing Harco and causing it to incur litigation expenses unnecessarily.

C.    **The Discovery Conducted and Sought**

(i)    **Depositions**

12.    The initial Rule 26(f) Report was entered into in November 2003 between Rosemount and Harco, before Powell was added as a party in the Amended Complaint that was served in December 2003.  Rosemount and Harco originally anticipated that each would require eight depositions of fact witnesses.  To date, there have been 14 depositions of party and non-party witnesses.  The majority of the deponents have been questioned by both sides.

13.    Rosemount has noticed a 30(b)(6) deposition of Harco that is scheduled to be taken in September, and it will require the testimony of about four Harco witnesses.

14.    Harco and Powell have noticed depositions of Monty Coats, the former President of Weed; Ronald Buchanan, the former President of Harco; and Joseph Biernat, whose name was added to Rosemount's amended witness list on June 3, 2004.  Rosemount has no objection to these depositions, and they are scheduled to be completed by the September 10, 2004 deadline.

15.    Rosemount objects to the 30(b)(6) deposition of Rosemount noticed by Defendants that is necessary to explore six discrete documents that were first made available to Defendants on July 7, 2004, in what has been a painstaking, piecemeal process of document production by Rosemount.  That deposition can be completed within a day or two, depending on the number of witnesses Rosemount will need to produce and scheduling, and it will require only a brief extension of the September 10, 2004 deadline for completing witness depositions.  Rosemount also objects to the deposition of James Rashid, the Group Counsel of Goodrich Corporation, the parent of Rosemount.  The Defendants seek a deposition of Mr. Rashid for a discrete and limited purpose explained below and anticipate that his deposition will be relatively

brief.  The depositions could have been completed before September 10, 2004, if Rosemount agreed to attend them when they were first noticed.

16.    The gamesmanship by Rosemount in the timing and methods of its document production warrants some elaboration to put this motion in proper context.  The Defendants' attorneys have had to travel to Minnesota three times and devote six days to examining more than 35 boxes of documents containing, at best guess, more than 30,000 pages that have been produced by Rosemount.  Rosemount refused to send the boxes of documents to its local counsel in Connecticut or to the offices of the Defendants' counsel in Connecticut for their examination at the convenience of defense counsel.  For the most part, there was little organization to the documents.

17.    The present circumstances began when Rosemount served responses to Harco's Third Request for Production of Documents by regular mail on April 21, 2004, that Defendants' counsel received on April 26, 2004.  There was no suggestion whatsoever in that response that additional documents would be produced.  Seven days later, by letter faxed after 3:00 p.m. on Wednesday afternoon, April 28, 2004, Rosemount's counsel first informed Defendants' counsel that there were approximately 21 boxes of documents responsive to those requests that were available for inspection in Minneapolis – that was four days before the depositions of Rosemount's President Jerry Witowski ("Witowski") and Vice President John Ginn ("Ginn") that were scheduled in Minneapolis on Monday and Tuesday, May 3 and 4.

18.    Such short notice about that quantity of documents was clearly improper – particularly since Rosemount's attorneys were previously aware that there were documents to be produced, but they had purposely delayed at least one week after serving written responses to the document demand to even report that documents existed. Rosemount's attorneys have offered no

explanation for that tactic.  Defense counsel requested production of certain of the documents prior to the depositions, however, Rosemount's counsel declined that request for the reasons that they did not have the personnel or time to do it.  Defense counsel also suggested that they would examine the documents in Minneapolis on May 3 and 4 and conduct the depositions on May 5, 6 or 7.  Rosemount's counsel declined that suggestion also; and instead, they offered June 3 and 4 or the week of June 14 as the next available dates for Ginn and Witowski, based on the schedules of Rosemount's counsel and their clients.  Since Defense counsel already had travel arrangements; and in order not to lose another month in which to complete discovery, Defense counsel responded that they would proceed with the scheduled depositions without prejudice to their rights concerning the production and examination of the documents.

19.    Ginn and Witowski were deposed on May 3 and 4, and Defense counsel reviewed the 21 boxes on May 5, but could not complete a thorough examination.  Defendants' attorneys could not return to Minneapolis until June 7, 8 and 9, when they next examined the 21 boxes.  During that visit, Rosemount's counsel revealed for the first time that there were written schedules describing the contents of 29 additional boxes of Weed documents yet to be produced and that had not been obtained from storage.  Rosemount's counsel requested that Defense counsel study the schedules and select the desired boxes of documents.  Defense counsel reviewed the schedules and identified 12 additional boxes of Weed documents to be produced. There was no reference to any Rosemount documents on the schedules.  Rosemount's counsel could not confirm when the boxes of documents could be obtained from storage before Defense counsel's scheduled return flight to Connecticut, and, therefore, counsel returned to Connecticut.

20.    As a result of the delayed production of documents,  a revised scheduling order between the parties was executed on July 1, 2004, extending the deadline for completing

fact witness depositions from July 1 to September 10, 2004, among other changes.  Defense counsel told Rosemount's counsel that July and August would be difficult for scheduling depositions because of a scheduled trial and depositions in other cases and vacation schedules of witnesses and counsel.  Defense counsel requested a deadline of September 17.  However, Rosemount's counsel insisted upon the September 10 date, and said he would cross the bridge of extending the date further when and if that became necessary.  Defense counsel agreed to the revised schedule, however, before having the opportunity to return to Minneapolis to examine the 12 boxes of additional documents they requested from storage, and learn yet another tactical surprise by Rosemount's counsel.

21.    On July 7 and 8, 2004, Defendants' attorneys returned to Minneapolis for a third time to examine the 12 additional boxes.  At that time, Rosemount's counsel revealed for the first time that two more boxes were being produced in addition to the 12, making it 14 additional boxes in all.  Those two boxes contained only Rosemount documents, including the six documents that are at issue for the Rosemount 30(b)(6) deposition.  The two additional boxes did not appear on the schedules previously shown to Defense counsel, presumably because they contained Rosemount documents, not Weed documents.  Defense counsel could not have predicted that they might need 30(b)(6) depositions of Rosemount before the revised scheduling order was signed because Rosemount's counsel misled Defense counsel to believe that only Weed documents remained for review.  Whether there are additional documents not yet produced remains a mystery.  One of the witnesses has testified that Weed shipped Rosemount about 100 boxes.  Rosemount's counsel has produced for review about half that number.

22.    Harco and Powell should not be prejudiced by Rosemount's piecemeal document production tactics and timing that precluded Defense counsel from using these

documents in prior depositions with other witnesses who might have been able to testify about them, or from making decisions about whom to depose based on the documents produced, or to specify on the July 1 revised scheduling order the additional necessary depositions besides those already identified.

23.    As demonstrated in Section (iii) below, the gamesmanship by Rosemount with respect to discovery has not been limited to the 35 boxes, and it is also a reason for the need to depose James Rashid.   For continuity, however, the reasons for discovery concerning the six documents at issue and Rosemount's 30(b)(6) deposition are described next.

### (ii)    The Documents At Issue for the Rosemount 30(b)(6) Deposition

24.    The crux of Rosemount's case is that Harco and Powell misappropriated certain trade secrets or proprietary information of Weed.  Harco and Powell maintain that Harco has been making aerospace temperature sensors for decades, and no trade secrets or proprietary information were misappropriated. Powell was an experienced aerospace engineer before he was hired by Weed, and he used his experience and know-how that he possessed before he worked at Weed, as well as professional growth gained at Weed, for the work that he did at Harco. The work Powell did for Harco did not involve any proprietary information or trade secrets of Weed.

25.    Rosemount has the burden to demonstrate, first, that Weed had proprietary information and trade secrets; and second, that they were misappropriated by the Defendants. Harco seeks 30(b)(6) depositions of persons at Rosemount who can testify about the six documents first made available to Defendants on July 7, 2004, because they are replete with references casting doubt on Rosemount's claims that the Weed information Rosemount bought was unique or proprietary, and they are also relevant to the Defendants' defenses. (A copy of the 30(b)(6) Notice is annexed as Exhibit 1.)  For brevity, all aspects of the documents that require

inquiry are not set forth here.  Also, Defendants should not be required to reveal all reasons before the deposition is conducted.  Nevertheless, some examples from each document amply demonstrate the point.  For example, the document entitled Business Plan Acquisition of Weed Instrument Company Aerospace Product Line (Exhibit 2) contains statements that may undermine Rosemount's contentions that Weed's TAT sensor is unique or proprietary.  It states, at  R010339:

> Due to the high degree of commonality [of products and technology between Rosemount and Weed], we believe these product line assets could be quickly transferred into the Rosemount Aerospace Eagan facility with minimal special training, and no facilities or incremental resources required.
>
> The major benefits of this product line acquisition are the significant commonality with existing Rosemount Aerospace products, processes, etc.  It is estimated that as much as 50% of Weed's aerospace products are nearly identical to Rosemount's Aerospace products.  The remaining products are felt to be largely similar to our current products. (R010351.)

Harco seeks further elaboration about these statements.[1]

26.    Also, Rosemount's witnesses, President, Jerry Witowski, and Vice President, John Ginn, have denied that Rosemount's acquisition of Weed was designed to eliminate competition in the TAT market.  That testimony is contradicted by several statements in the Business Plan that are relevant to the Defendants' defenses that Rosemount has unclean hands and commenced this action in bad faith to harass Harco, and to eliminate competition in the TAT market.  The statements demonstrate Rosemount's objectives are to thwart all competition in the TAT market.  The statements also corroborate other discovery demonstrating

---

[1]    Exhibits 2 through 9 are documents produced by Rosemount with the designation "Attorneys' Eyes Only Confidential," and, therefore, they are subject to the Assented To Protective Order in this case that requires filing of such documents under seal.  Those documents are being produced under seal in compliance with the Protective Order and Defendants request that the Court open and review the documents for this Motion.

that Rosemount's acquisition of Weed was designed to eliminate an alliance between Weed and

another company, Sextant, that would have competed with Rosemount in the European TAT

sensor market. For example, at Exhibit 2, R010346:

> There are several objectives to be accomplished through the acquisition of Weed's Aerospace Product line . . . Prevents a competitor from acquiring Weed and presenting a new and more complicated competitive threat to Rosemount Aerospace.

Also, at R010355, it states:

> Rosemount's Aerospace's interests in acquiring this business have five <u>main</u> thrusts:
>
> 4. Prevent a competitor, such as Allied Signal, <u>Sextant</u>, Ametech or Auxitrol from gaining additional temperature sensor technology. (Emphasis added.)

Indeed, that same document specifically acknowledges that "anti-trust issues" are

a risk to Rosemount. It provides, at R010361:

> Relative to this TAT market segment, we do not anticipate that there will be anti-trust issues for the following reasons: . . . Rosemount Aerospace recognizes that the above [anti-trust issue] is a risk area (although perceived as very low) pertinent to this acquisition.

27.    Similarly, the document entitled, "Weed Instrument Aerospace Product

Line Acquisition," (Exhibit 3) provides, at R010203: "Perceived that Weed would be an

attractive candidate to several of our competitors and that addition of Weed's capability would

unfavorably alter the competitive balance for key pursuits." Also, on a page in that document

entitled "Pre-signing Decisions" the following topics appear "Anti-Trust," "Legal risk of

enforceability," "Enforceability of Non-Compete." All these topics are relevant to Rosemount's

claims about the enforceability of the non-compete agreement and the Defendants' defenses to

Rosemount's claims.

28.     The document entitled "Weed Instrument Transfer" (Exhibit 4) also supports Harco's contention about Rosemount's motives and unclean hands with respect to Weed, and now Harco, because it confirms that there was a price war between Rosemount and Weed for the TAT sensor that contributed to Rosemount's acquisition of Weed.  It provides, in pertinent part (R010228-29):

> **Background:**
>
> > RMTAERO [Rosemount] SOLD TAT FOR APROX. $3000
> > WEED PURSUIT OF TAT BUSINESS
> > AGGRESSIVE
> > RELENTLESS
> > INVEST, INVEST, INVEST
> > INITIAL PURSUIT --- MIL. TAT, RMTAERO [Rosemount] 102CA2W
> > [Weed] QUALIFIED AND SOLD PART FOR APPROX. $1400
> > POTENTIAL [MIL-TAT] MARKET $ CUT IN HALF
> > RMTAERO [Rosemount] COUNTERS BY LOWERING PRICE AND
> > MANY OTHER ACTIONS
> > CURRENT [Rosemount] PRICE IS IN THE $990 RANGE
> > POTENTIAL [Rosemount] MARKET $ NOW DOWN TO A THIRD
>
> ASSUMPTION:  ALL TAT SENSORS WOULD BE IMPACTED

That same document also contradicts and raises questions about Rosemount's contentions that certain tools and equipment acquired from Weed are "unique."  The document provides, at R010233:

> > TOOLING, EQUIPMENT
> > — [Weed] VERY SIMILAR TO EAGAN [Rosemount]
> > — FEW NEW ITEMS

29.     In the same regard, in a document with a subheading:  "Huggins Presentation, What we have learned" appears the following, (Exhibit 5) at R010246:

> Technical Issues: Elements are similar in the types of materials used and methods to assemble are similar .  .  .  . Most element assembly techniques rely heavily on technique with a lot of torch brazing and coatings that are similar to our elements.

These statements also support the Defendants' contentions that the materials and methods to assemble the TAT sensor are hardly unique, proprietary or trade secrets. Deposition testimony concerning those contentions is clearly material and relevant.

30.    The document entitled, "Transfer Philosophy/General Guidelines" (Exhibit 6, R010235-37), is an outline of various subjects, including, "Information System Transfer, Documentation Transfer, Training Plan, Build Weed Design, Material Transfer Plan." Harco is entitled to discovery about what Rosemount acquired and how, why and what it did with what it acquired to further explore and understand Rosemount's allegations about trade secrets and proprietary information purportedly acquired. Also, what was done in the transfer process can be contrasted by inquiries concerning what Rosemount failed to do in the transfer process to protect Weed's purported trade secret or proprietary information.

31.    The document entitled "Transition Status" (Exhibit 7, R010252) states:

> Training of production personnel has not yet started – many unique processes need hands-on training, preferably during actual production. Original document transfer will begin this week.

Defendants are entitled to further elaboration about the "unique processes" and "document transfer" relating to proprietary information or trade secrets relevant to Rosemount's claims.

32.    The document entitled "Transition Plan" (Exhibit 7, R010253) states:

> All original engineering documents and drawings will be transferred directly into [Rosemount] Document Control System and Tooling/Training – Critical Tooling will be used
> . . . .

Defendants are entitled to further elaboration about those entries that are relevant to Rosemount's claims that certain documents and tools were proprietary to Weed. Defendants are entitled to explore what efforts were made to maintain the confidentiality of the documents and

tools under the Document Control System.  Similar entries and references are made in the document entitled "Weed Transfer" (Exhibit 7, R010254-57), and "Weed Transfer Plan" (Exhibit 7, R010268-70).  Precisely in that regard, Defendants have requested production of certain tools relevant in this action that Rosemount claims Harco copied from Weed's tools. However, Rosemount's counsel have said that the Weed tools cannot be found.  Some obvious questions are, why not and what happened to them?

33.    In summary, each of these documents is material and relevant to Rosemount's contentions, denied by Defendants, that the TAT sensor and tools used to make it qualify as trade secrets or proprietary information or that Defendants misappropriated trade secrets and proprietary information or interfered with the non-compete/confidentiality agreement.  They are also material and relevant to Rosemount's damages, and the defenses asserted by Defendants of the statute of limitations and that Rosemount has unclean hands and commenced this action in bad faith for improper purposes to harass Defendants.  The documents were not available to be used during the depositions of Ginn and Witowski.  The discovery will not be unreasonably cumulative or duplicative of prior discovery.  There is no more convenient or less burdensome source for the discovery.  For these reasons, as well as the tactics by Rosemount's counsel, the discovery is necessary and proper.

34.    On July 28, 2004, Harco filed a complaint in this Court against Rosemount and Goodrich Corporation, alleging antitrust violations.  Rosemount's counsel has suggested that one reason for his objection to the requested 30(b)(6) discovery is that such discovery can be conducted in the antitrust case.  Rosemount's counsel misses the point that these documents are material and relevant in this action for all the reasons set forth above.

(iii)    **The Rashid Deposition and the Fax Cover Sheet**

35.    Rosemount has relied on a certain "anonymous note and package" that it says it received in June 2000 to support the allegations in the Amended Complaint and its assertions of wrongdoing against Defendants.  The "anonymous note" (Exhibit 8) states:

> Brad Powell and Jorge Martinez have documents and tools
> from Weed Mfg. in TX and Lewis Engr. in CT that copy the
> TAT sensors made by you.

Rosemount's attorneys attached the anonymous note to a prior discovery motion submitted to this Court to persuade the Court of the Defendants' wrongdoing even though it is inadmissible, unauthenticated hearsay.   The document produced showed that it had been faxed, but no fax cover sheet was produced.

36.    The source of the information, its authenticity and substantiation of the message are relevant.  The envelope in which it was sent could show clues concerning the source of the information, such as a cancelled postage stamp, and the source of the information may lead to the discovery of the note's authenticity.  What Rosemount did about the note is also significant.  Defendants have repeatedly requested all documents and information surrounding the anonymous package, including the fax cover sheet.

37.    The fax cover sheet was specifically requested in Harco's Third Request for Production of Documents, Request No. 23:

> All documents relating to the "Anonymous package" Rosemount
> purportedly received in or about June 2000 concerning Brad
> Powell and Jorge Martinez, including, but not limited to, the
> envelope and/or package, the original contents, facsimile cover
> sheet or anything else related to it whatsoever.

38.    Rosemount responded to that request on April 21, 2004, by referring to documents produced in response to Harco's First and Second Requests for Documents and

documents produced in the Trademark Litigation.   The fax cover sheet was withheld from production and not identified in Rosemount's response.

39.    Rosemount's Vice President, John Ginn, testified on May 4 that he saw the original letter-sized envelope containing the anonymous package for the first time about six months before his deposition, when it was shown to him by Rosemount's attorneys, and that there probably was a fax cover sheet that accompanied it.   He said that he thought he remembered seeing that the envelope had postage on it.   He testified that the anonymous message concerned and bothered him because it alleged a misappropriation of intellectual property.   Ginn further testified, in substance, that he made no effort to determine whether the information in the anonymous note was true, and he did nothing concerning the information; nevertheless, he testified that the note was a primary basis for this lawsuit.

40.    According to Ginn, Plaintiff Rosemount Aerospace, Inc. was spun-off as a separate corporation by Rosemount, Inc. in 1990 or 1991.   Based on the documents produced, it appears that the anonymous package was purportedly first sent in error to Rosemount, Inc. in Eden Prairie, Minnesota.   It was then forwarded by fax to Rosemount Aerospace in Burnsville, Minnesota on June 27, 2000, and it was presumably also forwarded by mail.

41.    Defendants' counsel persisted with the request for production of the fax cover sheet after Ginn's deposition.   On May 18, 2004 - two weeks after Ginn's deposition - Rosemount's counsel finally produced the fax cover sheet, with redactions, and stated:

> That cover sheet was between Rosemount Aerospace and counsel, and is neither responsive to any requests nor relevant.   Moreover, it is arguably subject to attorney-client privilege and work product immunity.   Nonetheless, we are producing a redacted version of the cover page, which indicates the faxing information but deletes handwritten notes to or from counsel.

42.    The fax cover sheet (Exhibit 9) was never identified on any privilege log, as required under Rule 26(b)(5), and, therefore, there is a waiver of the privilege that might otherwise be asserted.  In addition, the contentions by Rosemount's counsel about the fax cover sheet are plainly false.  It was explicitly requested in Harco's Third Request for Production; it is plainly relevant to what Rosemount did with and about the anonymous note; and it was originally a fax between employees at Rosemount, Inc. and Rosemount Aerospace, Inc., not counsel.

43.    The fax cover sheet shows that an employee at Rosemount, Inc., Terry Krouth, faxed the anonymous note and accompanying papers to Larry Halsne, an employee at Rosemount Aerospace, on June 27, 2000.   Since Defense counsel did not have that document at the time of Ginn's deposition, they could not ask him any questions about it.  The timing of its production was clearly designed to avoid questions about it.

44.    There is more.  Following receipt of the fax cover sheet, Defense counsel requested information about Larry Halsne's availability for a deposition concerning the anonymous package.  Rosemount's counsel responded by stating that Mr. Halsne was no longer an employee of Goodrich Sensor Systems, and they were unable to obtain any forwarding address information.

45.    Defense counsel found Mr. Halsne's address and telephone number on the internet; called him to discuss the anonymous package and scheduling a deposition concerning it; and served him with a subpoena to testify on June 9, 2004.  During his first conversation with Defense counsel, Mr. Halsne was forthcoming about his recollections.   During a second conversation with Defense counsel the same day, Mr. Halsne said he wanted to speak to an attorney.  Rosemount's counsel next informed Defense counsel that they were representing Mr.

Halsne; and they said he was taking a vacation in northern Minnesota on June 9, and he would be unavailable for at least 10 days.

46.     The next available date for Mr. Halsne's deposition was July 8, 2004.  Mr. Halsne testified at his deposition that the first person he called after he spoke with Defense counsel was Rosemount's President, Jerry Witowski, and that Rosemount had his telephone number and address.  Therefore, the contention by Rosemount's counsel that they were unable to obtain Mr. Halsne's address was also false, and just another tactic to evade the taking of that deposition to conduct discovery about the "anonymous package."

47.     Mr. Halsne testified at his deposition that he had no recollection of whether he saw an envelope with the package in June 2000.  He conceded that it was the type of document he would have sent to the right person right away, but he did not recall to whom he sent it.  It also appears from the fax cover sheet, however, that in-house counsel for Rosemount Aerospace, James Rashid, and outside counsel, Daniel McDonald, received the anonymous package by fax from someone at Rosemount Aerospace on June 28, 2000.

48.     Certain information on the fax cover sheet was redacted by Mr. McDonald because he contends it is privileged.  The fax cover sheet was not identified by Rosemount on any privilege log.  For that reason alone, any privilege was waived and it should be produced without any redactions.   In the alternative,  Defendants request that the fax cover sheet be examined in camera so that this Court can rule whether the redacted information is privileged.

49.     Also, Defendants seek the deposition of Mr. Rashid concerning what happened to the envelope, as well as what, when and how efforts were taken to substantiate the author of the anonymous note and its veracity and to further pursue its importance, or if not, why not.  The deposition is relevant to Rosemount's reliance on the note as a basis for this suit, the

non-compete/confidentiality issues, as well as the statute of limitations and unclean hands defenses asserted by Defendants.  These subjects do not involve matters that are privileged. Defendants believe that the deposition will be relatively brief.  (Exhibit 10.)

50.    Mr. McDonald has rejected the Defendants' request for the deposition and offered his letter as an explanation.  (Exhibit 11.)  His letter, however, is not the same as testimony under oath, and it does not answer the questions Defendants seek to ask.

51.    The tactics and circumstances surrounding the fax cover sheet and anonymous package should not be countenanced by this Court, and the significance of that document justifies the deposition requested for the reasons set forth above.

52.    In sum, Defendants will be prejudiced in their defense of this action without the discovery requested by this Motion.   Defendants should not be penalized as a result of the tactics and gamesmanship by Rosemount and/or its counsel.

53.    Sanctions are warranted as a result of the tactics and gamesmanship by Rosemount and its counsel necessitating this motion.  Rosemount should be required to bear the expense of the depositions, including travel costs by Defense counsel, or Rosemount should be required to produce its witness(es) in Connecticut for the depositions, and bear the expense of the deposition.  Rosemount also should be required to bear the travel costs by Defense counsel to Minnesota the third time that Defense counsel went there to examine the multiple boxes of documents.

For all the foregoing reasons, Defendants respectfully request that the relief requested be granted in its entirety.   A Memorandum of Law accompanies this Motion.

**EPSTEIN BECKER & GREEN, P.C.**


By _____
    David S. Poppick, Esq. (#ct13202)
    Attorneys for Defendants
    HARCO LABORATORIES, INC.
    and BRAD POWELL
    One Landmark Square, 18th Floor
    Stamford, CT  06901
    (203) 348-3737

          and

    Robert B. Wise, Esq.
    WISE & WISE
    Attorneys for Defendant
    HARCO LABORATORIES, INC.
    1100 Summer Street
    Stamford, CT  06905
    (203) 359-8877

<u>CERTIFICATION</u>

The undersigned hereby certifies that a copy of the foregoing was sent, via Regular Mail, this 12th day of August, 2004 to:

Daniel W. McDonald, Esq. (ct23281)
William D. Schultz, Esq.(ct25198)
Joel E. Bergstrom, Esq.
Merchant & Gould PC
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

James Mahanna, Esq. (ct24681)
Day, Berry & Howard LLP
CityPlace 1
Hartford, CT  06103-3499
Telephone:  (860) 275-0100
Facsimile:  (860) 275-0343

_____
David S. Poppick

Office of the Clerk
United States District Court
450 Main Street
Hartford, CT 06103